RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0127p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LATIN AMERICANS FOR SOCIAL AND ECONOMIC DEVELOPMENT, CITIZENS WITH CHALLENGES, DETROIT ASSOCIATION OF BLACK ORGANIZATIONS, DETROITERS FOR PROGRESS, MANA DE METRO DETROIT, and MEXICAN PATRIOTIC COMMITTEE OF METRO DETROIT,

　　　　　*Plaintiffs-Appellants* (12-1558),

DETROIT INTERNATIONAL BRIDGE COMPANY,

　　　　　*Plaintiff-Appellant* (12-1556),

　　v.

ADMINISTRATOR OF THE FEDERAL HIGHWAY ADMINISTRATION, et al.,

　　　　　*Defendants-Appellees*.

Nos. 12-1556/1558

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cv-10082—Avern Cohn, District Judge.

Argued:  October 11, 2013

Decided and Filed:  June 20, 2014

Before:  BATCHELDER, Chief Judge; BOGGS, Circuit Judge; DOWD, District Judge.[*]

_____

## COUNSEL

**ARGUED:**  Lawrence T. García, GARCIA LAW GROUP, PLLC, Detroit, Michigan, for Appellants in 12-1558.  Hamish P.M. Hume, BOIES, SCHILLER & FLEXNER LLP, Washington, D.C., for Appellant in 12-1556.  Vivian H.W. Wang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  Lawrence T. García, GARCIA LAW GROUP, PLLC, Detroit, Michigan, for Appellants in 12-1558.  Hamish

_____

[*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

1

P.M. Hume, Amy L. Neuhardt, BOIES, SCHILLER & FLEXNER LLP, Washington, D.C., for Appellant in 12-1556.  Vivian H.W. Wang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

———————————

**OPINION**

———————————

DOWD, District Judge.  Latin Americans for Social and Economic Development and other plaintiffs sued the Federal Highway Administration (FHWA) and certain FHWA officials challenging the FHWA's Record of Decision (ROD) selecting the Delray neighborhood of Detroit, Michigan as the preferred location alternative for a new international bridge crossing between Detroit, Michigan and Windsor, Ontario.  Plaintiffs claim that the ROD and preceding process violated the National Environmental Protection Act, Administrative Procedures Act, principles of environmental justice, and other federal laws.

The district court granted the defendants' motion to affirm the ROD.  For the reasons that follow, the decision of the district court is AFFIRMED.

## I.  DISTRICT COURT PROCEEDINGS

Plaintiffs Latin Americans for Social and Economic Development, Citizens with Challenges, Detroit Association of Black Organizations, Detroiters for Progress, MANA de Metro Detroit, and the Mexican Patriotic Committee of Metro Detroit (collectively Community Groups), and the Detroit International Bridge Company (Bridge Company), sued defendants FHWA, the unnamed Administrator of the FHWA, and James J. Steele (Steele) in his official capacity as the Michigan Division Administrator of the FHWA (collectively Federal Defendants), challenging the FHWA's ROD issued on January 14, 2009, selecting the Delray neighborhood of Detroit, Michigan as the preferred location alternative for a new international bridge crossing between the United States and Canada.  Steele signed the ROD on behalf of the FHWA.

The Community Groups have ties to Detroit and the Delray neighborhood.  The Bridge Company owns and operates the Ambassador Bridge, an existing crossing between the United

States and Canada, located approximately two miles from the proposed new crossing. The Bridge Company also owns property in the Delray neighborhood and southwest Detroit.

Plaintiffs challenge the ROD pursuant to the provisions of the Administrative Procedures Act (APA). *See* 5 U.S.C. § 702. The complaint alleges that in selecting the Delray neighborhood as the preferred alternative, the Federal Defendants failed to comply with the requirements of: 1) the National Environmental Policy Act[1] (NEPA); 2) Section 4(f) of the Department of Transportation Act; 3) Section 106 of the National Historic Preservation Act (NHPA); and 4) "applicable legal authorities" on environmental justice. As District Judge Avern Cohn put it, "[s]imply stated, it is plaintiffs' contention that the NEPA process was pretextual and resulted in a decision that was arbitrary and capricious."

The Federal Defendants moved Judge Cohn to affirm the ROD selecting the Delray neighborhood as the preferred site for the new Detroit River International Crossing (DRIC), and challenged the Bridge Company's standing to oppose that choice. When an agency action is challenged under the APA, the reviewing court's factual examination is generally limited to the administrative record (AR or record). In this case, the AR underlying and documenting the ROD took some time to compile and file in an accessible manner. During this process, plaintiffs filed multiple motions to supplement the AR, some of which were granted by the district court and some of which were denied. Ultimately, the complete AR was filed by the Federal Defendants to the district court's satisfaction.

After the parties briefed their positions on the Federal Defendants' motion to affirm the ROD, the district court conducted a hearing. Judge Cohn subsequently issued a thorough and well-reasoned decision finding that the Bridge Company had prudential standing to challenge the ROD and granting the Federal Defendants' motion to affirm.[2] The Bridge Company and the Community Groups appeal.

---

[1]42 U.S.C. § 4321 *et seq.* NEPA established a national environmental policy and requires federal government agencies to analyze and disclose to the public the environmental effects of agency actions, but does not mandate the outcome of the agency action.

[2]Judge Cohn's order affirming the ROD indicates that plaintiffs abandoned their Section 4(f) and the NHPA claims. As a consequence, Judge Cohn adopted the Federal Defendants' arguments regarding Section 4(f)

## II.  ISSUES ON APPEAL

A.     The Bridge Company

Appellant Bridge Company raises multiple issues on appeal.   Initially, the Bridge Company contends that the FHWA violated NEPA and acted arbitrarily and capriciously and contrary to law by selecting the Delray neighborhood as the preferred crossing site because the FHWA allegedly:

1.     Pre-committed to building a government-owned bridge;

2.     Eliminated crossing site alternative X-12 based on "comity" to Canada;

3.     Failed to consider a "no build" alternative consisting of the Ambassador Bridge and its proposed second span;

4.     Relied on outdated traffic forecasts; and

5.     Relied on the need for crossing "redundancy" without a basis for doing so.

As a secondary issue, the Bridge Company contends that the district court erred in denying the Bridge Company's motion to supplement the administrative record with:

1.     A traffic study commissioned by Transport Canada; and

2.     Canadian documents allegedly relevant to Canada's reasons regarding elimination of crossing site alternative X-12.

B.     The Community Groups

On appeal, the Community Groups contend that the FHWA violated NEPA and principles of environmental justice by failing to take a "hard look" at alternative bridge proposals that would not be government-owned and/or not located in the minority, low-income community of Delray.

C.     Federal Defendants

The Federal Defendants argued before the district court that the Bridge Company lacked prudential standing because the Bridge Company's interest in this case is economic and not

---

and the NHPA, and found that neither statute had been violated.  *See Latin Americans for Social and Economic Development v. Administrator of the Federal Highway Administration*, 858 F. Supp. 2d 839, 850 n. 8 (E.D. Mich. 2012).  Plaintiffs do not appeal this portion of Judge Cohn's order.

environmental.  However, the Bridge Company alleged an environmental injury in the complaint due to concerns regarding air quality and noise in the Delray area where the Bridge Company owns property and does business, and Judge Cohn found that these alleged environmental injuries were sufficient to satisfy prudential standing under NEPA.

The Federal Defendants continue to challenge the Bridge Company's prudential standing. On appeal, the Federal Defendants contend that the Bridge Company's alleged environmental interests do not support a conclusion that the Bridge Company has prudential standing under NEPA.

### III.  GENERAL BACKGROUND SUMMARY

The DRIC process spanned about 8 years before the ROD at issue in this case was published on January 19, 2009.  The DRIC project began in 2001 with meetings between Canadian and United States government transportation agencies to discuss border transportation needs in the Detroit-Windsor area.  These agencies commissioned a planning and needs study that was completed in January 2004.  The study concluded that for a number of reasons, including increasing traffic volume, economic security and national security concerns, additional border-crossing capacity, connectivity and redundancy was needed in the Detroit-Windsor area.

During the years that followed before the ROD was issued, over 100 reports and studies were generated.  In addition to the United States and Canadian government transportation agencies that commissioned the original planning and needs study, many federal, state, and local agencies, elected officials, community representatives, interest groups, and the public were involved in numerous meetings, workshops, and hearings both to provide information and to receive feedback throughout the process.[3]

---

[3]The federal agencies participating in the DRIC process include the United States Army Corps of Engineers, United States Coast Guard, United States Environmental Protection Agency, United States Fish and Wildlife Service, United States General Services Administration (GSA), United States Department of Homeland Security, and the United States Department of State.  Final Environmental Impact Statement (FEIS) ES-4, DRIC014279.  All page references to the administrative record begin with "DRIC."  Also included where appropriate are page references specific to the underlying administrative record document.

The following is only a brief summary of a lengthy and exhaustive process that led up to the ROD issued in January 2009.  More detailed facts, as those facts are relevant to the court's analysis, are discussed later in the opinion.

A.    United States-Canadian Partnership

In 2001, the FHWA, the Michigan Department of Transportation (MDOT), Transport Canada, and the Ontario Ministry of Transportation, collectively known as the Border Transportation Partnership (the Partnership), entered into an Ontario-Michigan Border Transportation Partnership Framework agreement.  This document reflects the "consensus" of the Partnership regarding border transportation objectives.  FEIS Appendix B, DRIC014792-95.

The Partnership Framework defined objectives and created a working group and steering committee, which was responsible for making key Partnership decisions.  The Partnership recognized that the United States and Canadian governments each have unique laws and regulations that would guide their respective analysis and consideration of DRIC alternatives, and that a successful project would require reconciliation of their respective positions.  To accomplish this, one of the Partnership objectives was to use a coordinated planning and study process that would produce a result acceptable to all partners.  *See* FEIS Appendix B, DRIC014793; DRIC014796-97.

Another Partnership objective was to include both public and private stakeholders throughout the DRIC project process. To achieve that objective, an extensive public involvement plan was developed that included public meetings, workshops, newsletters, a website, public and private-sector advisory groups, and local agency groups.  FEIS Appendix J, DRIC105011-17.

After the DRIC project was underway, a "Memorandum of Cooperation Between the Department of Transportation of the United States of America and the Department of Transport of Canada on the Development of Additional Border Capacity at the Detroit-Windsor Gateway" was signed in November 2007, to be "consistent with the direction given at the North American Leaders' Summit on August 21, 2007 in Montebello, Quebec, Canada."  This Memorandum of Cooperation underscored the shared interests, objectives, and cooperation between the United States and Canada regarding the DRIC project, the national importance of this crossing to both

countries, and the need for the DRIC to "be subject to public oversight designed to protect the public interest of both nations" and to provide "system redundancy in the form of crossing options" and "redundancy in border operations." FEIS Appendix B, DRIC014799-800.

B.     Purpose and Need for the DRIC Project

The Partnership instituted a "Planning Needs and Feasibility Study" to assess border transportation needs in the Detroit-Windsor area, which was completed in January 2004. One aspect of the planning and needs assessment was traffic studies.

1. Initial Traffic Study

As part of the assessment process, multiple traffic reports and studies were produced and evaluated. The conclusion of both these studies and regional models was that increased border-crossing capacity would be needed in the Detroit-Windsor area over the next 30 years through 2035.

The traffic forecasts used in the DRIC project resulted from an extensive modeling process that took into account a variety of variables, including economic indicators, employment projections, fuel costs, exchange rates, labor conditions, and road construction projects. *See e.g.* DRIC109363-69; DRIC082258-60. The Partnership also considered regional traffic forecasts, which supported the DRIC project traffic models. DRIC057025; DRIC129273.

Various experts and stakeholders confirmed the results of the DRIC traffic modeling process and capacity forecasts, including SEMCOG (South East Michigan Council of Governments), the Brookings Institute, Chrysler, and Ford. DRIC005068. In addition to confirming that DRIC traffic models and results were reasonable, these entities also concluded that the no-growth traffic forecast submitted by the Bridge Company was not reasonable. DRIC005068; DRIC122760.

From all of these reports and studies, the Partnership concluded that additional border-crossing capacity was needed between Detroit, Michigan and Windsor, Ontario. ROD p. 1, DRIC016080. Specifically, the study concluded that 6-10 additional lanes were needed to accommodate the cross-border volume projected through 2035. *See* FEIS 1-13, DRIC014343.

2. Purpose and Needs Statement

The purposes and needs of the DRIC project were prepared to address at least a 30 year time-frame. The DRIC project purposes were stated to be:

1.      Provide safe, efficient and secure movement of people and goods across the United States - Canadian Border in the Detroit River area to support the economies of Michigan, Ontario, Canada, and the United States.[4]

2.      Support the mobility needs of national and civil defense to protect the homeland.[5]

After the tragic events of September 11, 2001, the interdependence between the economic security and homeland security of both the United States and Canada was brought into sharp focus. This interdependence, and the importance of Canada and the United States to each other's economies, heightened awareness of both the United States and Canada regarding the need for collaboration and secure infrastructure redundancy. DRIC001195. In order to accomplish the DRIC project purposes, the selected solution needed to address the requisite capacity, connectivity and redundancy for all components of the border-crossing system.

   a. *Capacity*

The Partnership's studies reflected that if significant growth occurs, traffic demand could exceed cross-border capacity in the Detroit-Windsor corridor as early as 2015. Even at the low end of the range, projected border-crossing capacity would be reached between 2030 and 2035, with capacity inadequacies occurring in both the lane capacity of the two existing crossings

---

[4]The border crossing in the Detroit-Windsor area is key to the economies of Canada and the United States. The United States and Canada have the one of largest bilateral trading relationships in the world, and Canada is the largest export market for 38 of 50 states, including Michigan. FEIS p.1-5, DRIC014335.
     Seventy percent of United States - Canada trade moves by truck. Approximately twenty-eight percent of that trade moves through the Detroit River area. *Id*. Based on projected growth, failure to improve the border crossing in the Detroit River area would cost the United States tens of thousands of jobs and billions of dollars in economic losses. FEIS 1-6, DRIC014336.

[5]The DRIC's statement of purpose and needs contains both defense and homeland security components. FEIS 1-6 – 1-8, DRIC 014336-38. The Detroit River crossing corridor is critically important to both the United States and Canada with respect to both national and civil defense and security. Both countries recognized the need for a "separate and secure infrastructure redundancy" to address these security concerns, not only with respect to the actual crossing itself, but for plazas and highway connections, as well. *Id.*

(Detroit-Windsor Tunnel and Ambassador Bridge) and in the roads leading to those crossings. FEIS 1-9 – 1-10, DRIC 014339-40.

Processing vehicles through customs at these crossing was also a capacity consideration. Increased traffic projections require increased border inspection processing capability. FEIS 1-12 – 1-13, DRIC014342-43.

### b. *Redundancy*

The purpose of redundant crossing systems is to provide adequate alternative pathways in order to avoid or minimize disruptions to the border and security of both countries, and to facilitate the uninterrupted flow of people and goods across the border in the Detroit-Windsor area in the event that other roadways, plazas, and crossings in the corridor become unavailable. FEIS 1-13 – 1-14, DRIC01434-44.[6] Crossing redundancy was identified by the Partnership as essential to accomplishing the DRIC project purposes.

The concept of redundancy encompasses plaza and access redundancy, in addition to the crossing itself. Two bridges side-by-side that share plazas and/or access provide only limited redundancy because an incident on an access road or plaza could shut down both bridges. "A new crossing at a different location, with separate inspection plazas and new connections to the freeway network in both countries, would provide a second, distinct crossing system and a greater degree of redundancy." FEIS 1-14, DRIC014344.

### c. *Connectivity*

Connectivity of crossing highways and roads was also essential to accomplishing DRIC project purposes. The Ambassador Bridge is more than 80 years old and is two lanes in each direction. Maintenance issues often require at least one lane to be closed, resulting in backups. In Canada, the signalized intersections along Huron Church Road, the access road to the Ambassador Bridge, are approaching capacity. Huron Church Road is expected to exceed

---

[6]The Canadian Standing Senate Committee on National Security and Defense's 2005 report recommended that "only those proposals for new crossing infrastructure at Windsor-Detroit which provide separate and secure infrastructure redundancy be considered (by such studies as the Detroit River International Crossing Study)." DRIC001195.

capacity in five to ten years due to increases in border-crossing traffic and background traffic, resulting in backups, congestion, and noise and air quality issues. FEIS 1-11, DRIC 014341.

The Detroit-Windsor Tunnel is one lane in each direction, and sharp curves in the approaches restrict truck usage. The approach roads to the Tunnel are its most limiting factor, with waiting vehicles backing up into downtown Detroit and downtown Windsor, and the backups are exacerbated by normal peak-hour congestion. *Id.*

### 3. End-to-end solution

To accomplish the purposes and needs for improved crossing capability in the Detroit-Windsor area, the possible solutions must:

1.   Provide additional border-crossing capacity to meet increased long-term demand;

2.   Improve system connectivity;

3.   Improve border operations and processing capability; and

4.   Provide reasonable and secure crossing options (redundancy) in the event of incidents, maintenance, congestion, or other disruptions.

ROD p. 9, DRIC016088; FEIS ES-1 – ES-2, DRIC014276-77.

With these goals in mind, the Partnership sought to evaluate solutions on an "end-to-end" basis. That is, when considering crossing solution alternatives, the Partnership would consider the impacts from a point at a freeway system in the United States, to Highway 401 in Canada, with a Detroit River crossing between. Because the United States and Canada each have unique laws and regulations that affect their respective analyses of the alternatives, evaluating alternatives and identifying a preferred alternative on an "end-to-end" basis would result in a preferred alternative acceptable to both the United States and Canada.

### C.   DRIC Project Alternatives

Having determined that improved border-crossing capabilities were needed in the Detroit-Windsor area, the Partnership began a process to identify and evaluate crossing-system alternatives. Based on projected traffic demand, possible alternatives were considered that

would provide for six lanes of traffic in addition to existing crossing capacity. FEIS 2-2, DRIC014346.

The process began with the identification of "illustrative alternatives" consisting of multiple crossing, plaza, and highway connection alternatives. Study and evaluation of the illustrative alternatives based on specific criteria resulted in a narrowing of alternative options to "practical alternatives." Study and evaluation of the practical alternatives based on specific criteria led to the selection of the "preferred alternative." Throughout the evaluation process, "[n]ational/international issues" were "<u>overriding considerations</u>[.]" DRIC001227 (emphasis in original).

### 1. Review of Illustrative Alternatives

In July 2005, the FHWA published a Scoping Report, which began the study and evaluation process for the DRIC project. DRIC001188 *et seq.* The MDOT conducted a scoping meeting on August 31, 2005 in Detroit, Michigan, which was open to the public. In addition to federal, state, and local agencies, the Local Advisory Council (consisting of representatives of community groups and local elected officials) and the Local Agency Group (consisting of technical professionals from local governments) also participated in the scoping meeting. Prior to the scoping meeting, the public was engaged through nearly monthly meetings beginning in March 2005 with the Local Advisory Council to provide input into the study process. FEIS ES-4, DRIC014279.

The DRIC project began with consideration of 15 possible crossing sites – X-1 through X-15 – and various combinations of connectors and plazas for each crossing site. Another illustrative alternative – X-16 – was added in response to public input. Also considered were 4 proposals by the private sector, including appellant Bridge Company's proposal to build a replacement span adjacent to the Ambassador Bridge.

Each Illustrative Alternative was scored on seven evaluation criteria[7] by involved citizens and the Partnership's technical teams.[8]   In addition to this scoring process, each Illustrative Alternative was examined for cost-effectiveness and ability to fulfill the DRIC project objectives of providing cross-border mobility consistent with the DRIC project's purposes and needs.  The Illustrative Alternatives were also compared with existing crossings and a "no action" variation, further described below.  DRIC014355; DRIC001220.

The purpose of this evaluation and analysis was to narrow the list of Illustrative Alternatives to a shorter list of Practical Alternatives.  Some of the Illustrative Alternatives were eliminated due to unique circumstances or "fatal flaws," such as construction and environmental issues, cost, and engineering feasibility.  *See e.g.,* FEIS 2-5 and 2-11, DRIC014348 and DRIC014354.  In addition, the Downriver area crossings X-1, X-2, X-3 and X-4, and X-15 in the Belle Isle area were eliminated from further consideration due to ratings in the bottom half of all alternatives in five of the seven evaluation areas.  FEIS 2-5 and 2-11, DRIC014348 and DRIC014354.

Alternative crossings X-5 and X-9 were eliminated based on the analysis of both the United States and Canada because of their impact on the continued production of a U.S. Steel plant.  FEIS 2-13, DRIC014356.  Alternative crossings X-13 and X-14 were also eliminated because of their "impacts to neighborhoods, which included minority and low-income population groups' plans for the future, cultural resources and air quality."  FEIS 2-14, DRIC 014357. Other alternatives were eliminated based on input from the public and impact assessment.  FEIS 2-39, DRIC014382.

---

[7]The Illustrative Alternatives were evaluated on how they would: 1) protect neighborhood characteristics; 2) maintain consistency with local planning; 3) protect cultural resources; 4) protect the natural environment; 5) improve regional mobility; 6) maintain air quality; 7) and be constructable. FEIS 2-5, DRIC014348.

[8]Both countries assessed the Illustrative Alternatives from their perspective, then each alternative underwent a joint evaluation in which each side took into account the other country's assessment.  FEIS 2-1 – 2-2. DRIC014345-46.

2.  Illustrative Alternative X-12

The location of one of the Illustrative Alternatives, X-12, was virtually the same location at which appellant Bridge Company planned to build a "second span" to the existing Ambassador Bridge.  The draft environmental impact statement identifies Illustrative Alternative X-12 as the "proposed second span of the Ambassador Bridge."  DEIS 2-11.  Crossing X-12 has also been referred to as the "twinning" of the Ambassador Bridge.  DRIC014802.

Illustrative Alternative X-12 was not advanced as a Practical Alternative because of concerns raised by both the United States and Canada.  On the Canadian side, X-12 ranked low in the Illustrative Alternative ranking process when scored against the established criteria because of unacceptable impacts to Canada's Huron Church Road corridor and the historic Sandwich community, which were "notably higher than [impacts] of the other Illustrative Alternatives."  FEIS 2-14, DRIC014357.  On the United States side, X-12 scored well on some evaluation criteria and poorly on others, but overall was highly ranked by the United States evaluators.

In addition to ranking Illustrative Alternatives based on established criteria, Illustrative Alternatives were examined for cost-effectiveness and ability to fulfill DRIC project purposes and needs.  On this assessment, Illustrative Alternative X-12 did not fully satisfy the DRIC project need requirements of efficiency of freeway-to-freeway access and system availability through redundancy, nor did it fare well in the joint impact assessment by the Partnership.  FEIS 2-14 – 2-15, DRIC 014357-58.

For all these reasons, Illustrative Alternative X-12 was not advanced as a Practical Alternative.  As will be discussed in more detail later, the Bridge Company claims that failure to advance X-12 as a Practical Alternative violated NEPA.  This claimed violation takes multiple forms, including an alleged pre-commitment to government ownership and the FHWA's alleged deference to Canada.

3.  Review of Practical Alternatives

By December 2005, analysis of Illustrative Alternatives was complete, and the Partnership focused on an area between Zug Island and the existing Ambassador Bridge for an analysis of Practical Alternatives. The analysis of Practical Alternatives spanned about 18 months from December 2005 to July 2007.

The practical "build" alternatives consisted of three crossings – X-10A, X-10B, and X-11 – and various combinations of highway interchanges and plazas. These Practical Alternatives were further studied by the FHWA and the Partnership against established evaluation criteria. In addition to the Partnership agencies, various federal agencies independently reviewed various aspects of the Practical Alternatives, including the GSA and United States Customs and Border Protection.

4.  Review of "no build" Alternatives

NEPA requires that a federal agency also consider a "no action" alternative along with other alternatives. The "no action" alternative is also sometimes referred to as a "no build" alternative. The FHWA evaluated and compared the "build" alternatives to the "no build" alternatives of building no bridge at all.

In addition to evaluating existing crossings as "no action" alternatives, the FHWA also considered a variation of the "no build" alternative. That variation was the Bridge Company's proposal to privately build a new six-lane span next to the existing Ambassador Bridge using existing plazas and highway connections currently in place for the Ambassador Bridge. The FHWA compared and evaluated the "no build" alternatives and Practical Alternatives against over two dozen factors and criteria. *See* FEIS Sections 2 and 3.

As will be discussed later in greater detail, the Bridge Company contends that the FHWA considered the wrong variation of the "no build" alternative. According to the environmental assessment submitted by the Bridge Company to the Coast Guard, if the new privately constructed bridge were completed, the existing Ambassador Bridge would be taken out of service for repairs and then reopened for use by pedestrians and bicyclists. FEIS 3-128,

DRIC014615. This scenario would have resulted in a net gain of only two lanes. However, the Bridge Company claims that it left open the option, at its discretion, to re-open the Ambassador Bridge if conditions warranted. As a consequence, the Bridge Company contends that the FHWA should have considered the proposed privately constructed six-lane bridge, **plus** a fully functioning re-opened four-lane Ambassador Bridge, for a net gain of six lanes.

### 5. Preferred Alternative Crossing X-10B

Reviewing the Practical Alternatives consisting of three crossings (X-10A, X-10B, and X-11) and nine plaza/interchange combinations, the FHWA and the Partnership evaluated each combination against established criteria and joint impacts on an end-to-end basis to arrive at a Preferred Alternative. An extensive comparison was made between the Preferred Alternative and the "no build" alternatives. The points of comparison include environmental justice, relocation, traffic, noise, jobs, air quality, environmental issues, cost etc. Those comparisons are detailed in the FEIS (ES 26-62) and FEIS Section 3, and are summarized in the FEIS on Table S-10 (DRIC014329-30).

After comparing the technical data regarding plaza connections, traffic, risk, cost, relocations of residential properties, relocations of active businesses, historic structures, access to major highways, and a host of other factors, the FHWA and the Partnership determined that the Practical Alternative that best met the purposes and needs of the DRIC project with the least adverse impact was crossing X-10B in the Delray neighborhood of Detroit. FEIS ES-16-19; DRIC014291-96. The State Department concurred with the FHWA's selection of the Preferred Alternative. DRIC076792; DRIC 116902.

### 6. Review of Ownership and Governance

The actual physical crossing system options were not the only aspect of the DRIC project that was subject to extensive analysis by the FHWA and the Partnership. Crossing system ownership and governance issues were also critically important to accomplishing the project's purposes and needs.

A number of ownership/governance scenarios were considered and analyzed throughout the DRIC project. In considering the options, the Partnership was committed to private sector involvement with public oversight to ensure a safe and secure international border crossing.

Four ownership/governance scenarios were considered by the FHWA and the Partnership: 1) government owned and operated; 2) public-private partnership-concession with government ownership; 3) bi-national authority; and 4) private-sector owned and operated with government oversight. These four scenarios were evaluated against the following objectives: to 1) provide safe and secure crossing; 2) ensure efficient and integrated cross-border movement of people, goods and services; 3) minimize use of public funds to the extent possible; 4) provide public transparency and accountability; and 5) protect the public interest. FEIS 3-247 – 3-250, DRIC014641-44.

Like the physical-crossing alternatives, the scenarios for ownership and governance of the crossings were subject to public comment and discussion throughout the process. After evaluation of the four options against the established criteria and the balancing of the outcomes with the DRIC project's purposes and needs, the scenario selected was government ownership with a public-private partnership. FEIS 3-247, DRIC014641.

D.      Preparation and Publication of Environmental Impact Statements

NEPA requires federal agencies to conduct environmental assessments of their proposed actions and to make those environmental impacts available for public review. The DRIC project conducted an environmental assessment for each crossing alternative, as well as for the "no action" alternatives. The results were published in a draft environmental impact statement (DEIS) that was issued in February 2008. The draft statement was widely available and subject to public hearings and comments.

On December 8, 2008, the final environmental impact statement (FEIS) was published in the Federal Register and was distributed and widely available to the public. The FEIS contains the comments to the DEIS. Like the draft statement, the FEIS was subject to public scrutiny and comments. The ROD was issued in January 2009, and contains the comments to the FEIS.

E.      Reports and Outreach Efforts

Over one hundred reports and studies were generated during the DRIC process that led to the selection of the Preferred Alternative and the final ROD. A table prepared by the FHWA lists the name and date of each report and study, as well as the corresponding AR document number for each report and study in the administrative record. This table was attached to the district court's opinion as Exhibit 1. These reports and studies include, but are not limited to, need and feasibility analysis, traffic analysis, air quality analysis, cultural analysis and archeological resources, engineering analysis, and impacts analysis. The reports were available to the public on the DRIC project website as well as at numerous physical locations, including MDOT offices, libraries, community centers, recreation centers, and local city halls in the Detroit area. FEIS Forward, DRIC014259.

The DRIC process also included a public-involvement plan. FEIS Exhibit J, DRIC015011-17. Public outreach included a website; toll free project line; methods for submitting comments; public meetings, and workshops; field offices; agency meetings with local groups and governments representing various constituencies; project materials, mailings and flyers in multiple languages; news releases; and television, newspaper, and radio communications. Meetings were held almost every month beginning in March 2005 with a Local Advisory Council, consisting of community representatives, elected officials, and various interest groups to review and provide input into the DRIC process. Seventeen public workshops and 13 formal public meetings, with advance public notice of each, were held to discuss the DRIC project and provide input, along with dozens of informal meetings with citizens, interest groups, and elected officials.

After the scoping meeting in Detroit on August 31, 2005, approximately thirty meetings were held with various involved governmental agencies. FEIS ES-4, DRIC014279. The Partnership even conducted boat and bus tours on both sides of the Detroit River to examine potential crossing sites and impacts. The tours were open to agencies, Local Advisory Council members, and the public. FEIS p. 6-11, DRIC014705.

When the DEIS was released, public hearings were held on March 18 and 19, 2008. Prior to those hearings, notice was provided and the DEIS and supporting technical reports were available for review. The hearings were conducted in a format that included an open forum, formal presentations, and an open microphone session. After the hearings, numerous meetings were held with state and local government officials and organizations regarding the DEIS. Comments were taken at the meetings themselves, by mail, e-mail, fax, or other means until May 29, 2008, the final day of a requested 30-day extension of the comment period. All the oral comments at the hearing and those submitted in writing during the comment period were documented and made available to the public in the same manner as the other DRIC project documents. In response to the comments, an additional meeting was held and all materials were presented in Spanish with a translator available for the presentation, questions, and comments. FEIS ES-5 and 6, DRIC014280-81. Section 6 of the FEIS documents the dates, locations, and purpose of the various meetings and outreach conducted in connection with the DRIC project.

A similar process of document publication and distribution, hearings, and comment period was undertaken when the FEIS was issued.

## IV. SUMMARY OF APPLICABLE LAW

A.    Standard of Review

1. APA/NEPA

Agency compliance with NEPA is reviewed under the APA. *Friends of Tims Ford v. Tennessee Valley Authority,* 585 F.3d 955, 967 n.3 (6th Cir. 2009) ("NEPA does not authorize a private right of action but judicial review is granted through the APA" (citations omitted)); *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 339 (6th Cir. 2006) ("When faced with a lawsuit under the National Environmental Policy Act, a federal court has authority to review the agency's action under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*"); *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) ("We have long recognized that federal courts have jurisdiction over NEPA challenges pursuant to the APA . . . .") (citing *Environmental Defense Fund v. TVA*, 468 F.2d 1164, 1171 (6th Cir. 1972)). When reviewing an administrative agency's final decision under the APA, this court reviews the district court's

decision *de novo*. *Meister v. U.S. Dep't of Agriculture*, 623 F.3d 363, 370 (6th Cir. 2010) (citing *Schuck v. Frank*, 27 F.3d 194, 197 (6th Cir. 1994)); *Slater*, 120 F.3d at 632 (citing *Schuck*, 27 F.3d at 197 (6th Cir. 1994)).

### 2. Administrative Record

A district court's denial of a motion to supplement the administrative record is "akin to 'a . . . denial of discovery.'" *Slater*, 120 F.3d at 639 (quoting *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996)). Accordingly, that decision is reviewed on appeal for abuse of discretion. *Id.* "An abuse of discretion exists when a reviewing court is firmly convinced that a mistake has been made." *Rorrer v. City of Stow*, 743 F.3d 1025, 1048 (6th Cir. 2014).

### 3. NEPA Standing

Whether a party has standing to assert a claim under NEPA is a question of law subject to *de novo* review. *Friends of Tims Ford*, 585 F.3d at 966. A plaintiff seeking judicial review under the APA must not only meet constitutional requirements for standing, but must also demonstrate prudential standing. Prudential standing exists if the interest the plaintiff seeks to protect is within the "zone of interests" to be protected or regulated by the statute at issue. *Friends of Tims Ford*, 585 F.3d at 967. In this case, the statute at issue is NEPA and the zone of interest is environmental interests.

### B.     National Environmental Policy Act Requirements

NEPA was enacted to promote efforts by federal agencies to prevent damage to the environment and advance human health and welfare. 42 U.S.C. § 4321. To accomplish this, agencies planning "major Federal actions affecting the quality of the human environment" must consider the environmental effects of the action at issue and alternatives to that action. *See* 42 U.S.C. § 4332(2)(C). Council on Environmental Quality regulations implementing NEPA require agencies to insure environmental information is available to the public before decisions are made and action is taken, and that decisions are made with an understanding of environmental consequences. 40 C.F.R. § 1500.1(b) and (c).

However, NEPA serves procedural rather than substantive goals, and is not a "results-driven" statute. "'[E]ven agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs.'" *Kentuckians for the Commonwealth v. United States Army Corps of Engineers*, 746 F.3d 698, 706 (6th Cir. 2014) (quoting *Ohio Valley Envt'l Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 191 (4th Cir. 2009)); *see Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (NEPA "does not mandate particular results, but simply prescribes the necessary process"); *Save Our Cumberland Mountains*, 453 F.3d at 338 (NEPA "serves procedural rather than substantive goals. It does not require agencies to 'achieve particular substantive environmental results . . . .'") (quoting *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989)); *Meister*, 623 F.3d at 377. These procedural goals insure that administrative decisions are "fully informed and well-considered." *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 558 (1978).

One of NEPA's procedural requirements is that the agency "study, develop, and describe appropriate alternatives to recommended courses of action" and issue a "detailed statement" regarding those alternatives, known as an environmental impact statement. *Meister*, 623 F.3d at 377 (quoting 42 U.S.C. § 4332(2)(E)); 42 U.S.C. § 4332(2)(C); *Save Our Cumberland Mountains*, 453 F.3d at 338. Guidance regarding the environmental impact statement is found at 40 C.F.R. § 1502.14:

> Based on the information and analysis presented in the sections on the Affected Environment § 1502.15 and the Environmental Consequences § 1502.16, it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:
>
>     (a)    Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.
>
>     (b)    Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c)     Include reasonable alternatives not within the jurisdiction of the lead agency.

(d)     Include the alternative of no action.[9]

(e)     Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f)     Include appropriate mitigation measures not already included in the proposed action or alternatives.

The effect of NEPA's "action-forcing" procedures is that agencies take a "hard look" at environmental consequences of agency actions. *Kentucky Riverkeeper*, 714 F.3d at 407 (quoting *Methow Valley Citizens Council,* 490 U.S. at 350). However, NEPA does not require the agency to select the alternative with the least environmental impact. *Kentuckians for the Commonwealth*, 746 F.3d at 706.

C.     NEPA Review Under the Administrative Procedures Act

Judicial review of an agency decision under NEPA is governed by the APA. 5 U.S.C. § 551 *et seq.* Under the APA, a right of action accrues at the time of a final agency action. 5 U.S.C. § 704. A record of decision issued by the Federal Highway Administration is a final agency action. *Slater*, 120 F.3d at 631 (stating that it is well-established that a ROD constitutes a final agency action for purposes of the APA).

Under the APA, the court will set aside a final agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Slater*, 120 F.3d at 632 (citing *Marsh*, 490 U.S. at 375); *Communities, Inc. v. Busey*, 956 F.2d 619, 623 (6th Cir. 1992); 5 U.S.C. § 706(2)(A) & (D)). In making this assessment, the court must determine whether the agency considered the relevant factors and has provided an explanation that rationally connects the data with the choice made.[10] *Aracoma Coal Co.*, 556 F.3d at 192 (citing

---

[9]The "no action" alternative is sometimes also referred to as the "no build" alternative.

[10]On the other side of the coin, an agency action is arbitrary or capricious if the agency has:

relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the

*Citizens to Preserve Overton Park*, 401 U.S. 401, 417 (1971) and *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

In APA actions involving NEPA, there is a special standard of review for arbitrariness. "'In deciding whether the agency acted arbitrarily, we will not substitute our own judgment' for that of the agency, 'but we will insist that the agency has, in fact, adequately studied the issue and taken a hard look at the environmental consequences of its decision.'" *Meister*, 623 F.3d at 377 (quoting *Save Our Cumberland Mountains*, 453 F.3d at 339); *see Kentucky Riverkeeper, Inc.*, 714 F.3d at 407 (judicial review is limited to ensuring an agency adequately considered and disclosed environmental impacts and the agency's decision is not arbitrary and capricious); *see also Citizens for Balanced Env't & Transp. v. Volpe*, 650 F.2d 455, 462 (2d Cir. 1981) (reviewing court does not sit as a super agency conducting a *de novo* review of the information received and considered by the agency).

A court's review under this standard is highly deferential to agency decisions. However, "[a]n agency is not entitled to deference simply because it is an agency. It is true that agencies are more specialized than courts are. But for courts to defer to them, agencies must do more than announce the fact of their comparative advantage; they must actually use it." *Meister*, 623 F.3d at 367.

Normally, a court's review of an agency action under the APA to determine whether the agency decision was arbitrary and capricious is limited to the administrative record, which includes materials compiled by the agency at the time its decision was made. *Slater*, 120 F.3d at 638. However, certain circumstances justify supplementation of the administrative record. Such circumstances include when an agency has deliberately or negligently excluded certain documents from the record, or when a court needs certain "background" information to determine whether the agency has considered all relevant factors. *Id*. The burden is on the

---

evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d at 407 (quoting *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007)); *Meister*, 623 F.3d at 371 (quoting *Motor Vehicles Mfs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Inc. Co.*, 463 U.S. 29, 43 (1983)).

plaintiff to justify supplementation of the record and plaintiff must make a "strong showing" of bad faith. *Id.* (citing *James Madison*, 82 F.3d at 1095).

D.      Environmental Justice

Executive Order 12898 (Executive Order), as amended, 59 F.R. 7629 (1994), instructs agencies to identify and address disproportionately high and adverse human health and environmental effects on minority and low-income populations. E.O. 12898, 59 Fed. Reg. 7629, 7633 (1994). However, the Executive Order expressly precludes the right to judicial review:

> Judicial Review. This order is intended only to improve the internal management of the executive branch and is not intended to, nor does it create any right, benefit, or trust responsibility, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies, its officers, or any person. This order shall not be construed to create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with this order.

> E.O. 12898, 59 Fed. Reg. 7629, 7633 (Feb. 11, 1994).

Although the Executive Order does not create a right to judicial review, some courts have reviewed environmental justice claims under the APA's arbitrary and capricious standard. *See e.g. Coliseum Square Ass'n, Inc. v. Jackson,* 465 F.3d 215, 232 (5th Cir. 2006) (environmental justice study part of NEPA analysis reviewed as part of administrative record subject to arbitrary and capricious review); *but see City of Dallas, Tex. v. Hall,* 2007 WL 3125311 at *6 (W.D.Tenn. Sept. 4, 2013) (if mandates of executive orders are not part of NEPA analysis, then agency's compliance with executive orders is not subject to review under the APA's arbitrary and capricious standard).

This court has not directly ruled on the question of whether an environmental justice claim can be asserted as a NEPA violation under the APA's "arbitrary and capricious" standard.[11] However, our court recently affirmed a district court decision that an environmental justice review by the Army Corps of Engineers was not "arbitrary and capricious." *Kentuckians*

---

[11]Recognizing that the Sixth Circuit had not addressed this issue but putting that question aside for the purpose of analysis, Judge Cohn concluded that the FHWA satisfied its environmental justice obligations.

*for the Commonwealth*, 746 F.3d at 705. In this case, the environmental justice study undertaken by the FHWA was part of the NEPA analysis and part of the AR.

## V. ANALYSIS

A.     The Bridge Company has Prudential Standing

Federal Defendants argued before the district court, and now before this panel, that the Bridge Company lacks standing in this case under NEPA. Specifically, the Federal Defendants claim that the Bridge Company lacks prudential standing because its allegation that the FHWA violated NEPA is based on economic injuries and not environmental injuries.

Appellant Bridge Company owns the Ambassador Bridge and asserts that it has plans to build another bridge across the Detroit River. A decision by the FHWA to build another bridge–this one publicly owned–may adversely affect the Bridge Company's economic interests. Economic injury alone is insufficient to establish prudential standing under NEPA. *ANR Pipeline Co. v. Fed. Energy Regulatory Comm'n*, 205 F.3d 403 (D.C. Cir. 2000) (economic interest of a competitor does not satisfy prudential standing requirements under NEPA); *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993) ("The purpose of NEPA is to protect the environment, not the economic interests of those adversely affected by agency decisions."); *Rosebud Sioux Tribe v. McDivit*, 286 F.3d 1031, 1038 (8th Cir. 2002).

The Federal Defendants assert that statements in the record by the Bridge Company demonstrate that the Bridge Company's interest in this case is entirely economic. By way of example, the FHWA advances statements by the Bridge Company that the DRIC project bridge will "poach," "steal," and "cannibalize" traffic from the Ambassador Bridge. However, the Bridge Company alleges in the complaint that it owns property in Delray where the new bridge is proposed and that the DRIC bridge in Delary will have an adverse impact on air quality and noise in those neighborhoods.

The district court concluded that motives that rest on both economic and environmental concerns do not deprive the Bridge Company of standing under NEPA. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. USDA*, 415 F.3d 1078, 1103 (9th Cir. 2005).

We agree, and hold that the environmental injuries alleged by the Bridge Company are sufficient to support prudential standing to bring a NEPA claim in this case.

B.    Public ownership of DRIC Project does not violate NEPA

The Bridge Company claims that the FHWA violated NEPA because it "pre-committed" to a government-owned bridge without reason or the benefit of public scrutiny, and without analyzing private-sector alternatives having less environmental impact.[12]   However, public discussion regarding DRIC ownership and governance issues began early in the process with the first round of Public Information Open Houses (PIOH), which were held November 12-14, 2002.

At the PIOH, the findings of preliminary study documents were shared and the public was asked to provide comments on the preliminary findings and any other issues pertaining to the study.  Planning/Needs and Feasibility Study Report pp. 7-8; DRIC015452-53.  The major issues raised by PIOH attendees are summarized in Table 2.1 of the Planning/Needs and Feasibility Study Report.  One of the comments and concerns raised by PIOH attendees and reflected on the summary table is "opposition to private ownership of existing or new crossings." The Partnership's response as reflected in Table 2.1 is: "The responsibility and cost of constructing and operating a new or expanded crossing, whether public, private, or some combination, is an issue that is currently under study by the four governments sponsoring the study."  Planning/Needs and Feasibility Study Report p. 14, DRIC015459.

And indeed it was under study.  In the early phases of the DRIC project, the subject of ownership and governance was extensively considered by the Partnership Steering Committee. DRIC ownership and governance issues were a specific agenda item and the subject of two "discussion papers" considered at a DRIC Steering Committee Meeting on November 12, 2003. The two discussion papers concerning governance of the DRIC project were prepared by URS, an engineering company, for the Canadian partners and by the FHWA for the United States

---

[12]As evidence of pre-commitment, the Bridge Company quotes language from the AR at DRIC014326, DROC014642, and DRIC015832 stating that "the partnership is committed to public ownership."  However, these citations do not support the Bridge Company's position.   The quoted citations are contained in the final environmental impact statement and frequently asked questions that were issued in December 2008, and state the FHWA's *conclusion* regarding the issue of DRIC governance and ownership reached after extensive analysis at the end of the process and are not evidence of "pre-commitment" to public ownership.

partners.  These discussion papers identified multiple ownership/governance scenarios, including a privately owned and operated crossing, a publicly owned crossing, and a public-private partnership.[13]  Criteria for the analysis of each governance scenario, including border-related goals and priorities for the United States and Canada, were identified in the discussion papers, along with the pros and cons of each scenario.  DRIC-SUPP001684-1696.

As the DRIC project progressed, the DRIC ownership and governance issue remained a subject of consideration.  The DEIS was issued on February 15, 2008 and was distributed for review and comment to federal, state and local agencies, and the public.

The DEIS states in the very first section that "another role of the Partnership is to study different methods of ownership, operation, and maintenance of an expanded or new border crossing."  DEIS pp. 1-3.  Later in the DEIS, an entire section is devoted to ownership and governance options.  DEIS Section 3.20 begins as follows: "Key to the construction and operation of the DRIC project is determining a suitable governance structure to manage and implement the project.  The Partnership is committed to maintaining public *oversight* of the crossing and has established that it will be governed by one of several models . . . ."  DEIS p. 3-206 (emphasis added).  The governance models listed in the DEIS are: government owned and operated; private-sector owned and operated with government oversight; public-private partnership – government ownership with private concession; and bi-national authority.  The DEIS governance section concludes with an evaluation of each model against five objectives. DEIS pp. 3-206 – 3-209.

The possibility of a publicly owned crossing, as one of four options, was before the public from the beginning of the DRIC project.  Community vision statements contained in the DEIS contemplated future conditions both with and without a new river crossing.  The vision statement for a new crossing specifically contemplates a publicly owned and operated crossing. DEIS p. 3-48.

---

[13]Multiple options for achieving a public-private partnership were identified by the discussion papers. Within these options, both private and public ownership to achieve such a partnership were discussed.

Various methods for comment on the DEIS were provided, including a comment form, public hearings, and the internet. Public hearings were held on March 18 and 19, 2008. The public record was open for comments until May 29, 2008. A record of comments on the DEIS and responses is contained in Table 6-4 and Appendix F to the FEIS.

After extensive consideration by the FHWA, both of its own analysis and input received from both public and private stakeholders, the FEIS was issued in December 2008. The FEIS stated the FHWA's conclusion, for the first time, that the Preferred Alternative selected as the border-crossing solution would be publicly owned by both countries and would include private sector involvement in some combination of design, financing, operations, and/or maintenance of the crossing. FEIS p. 3-247, DRIC014641.[14]

The Bridge Company's claim that the FHWA pre-committed to government ownership and this pre-commitment was sprung on the public in the FEIS is not supported by the record. In its arguments, the Bridge Company equates "public oversight" to a "prerequisite for public ownership." However, ownership and oversight are two entirely different concepts that are not fungible. It is apparent from the record that the FHWA did not pre-commit to government ownership. The various governance scenarios under study by the Partnership during the entire length of the DRIC project process included the scenario of *private ownership* paired with public oversight. The FHWA's decision regarding government ownership announced in December 2008 occurred at the conclusion of an almost decade-long process, and does not support in any way the Bridge Company's claim that the FHWA was pre-committed to government ownership of the DRIC or that the FHWA's ultimate ownership decision was arbitrary and capricious.

To the contrary, the record amply reflects that the FHWA's decision regarding DRIC governance was a lengthy, reasoned process based on an objective analysis subject to public scrutiny throughout. NEPA does not mandate a specific outcome, but a process. The FHWA took a hard look at the pros and cons of the various ownership/governance scenarios and

---

[14]Like the DEIS, the FEIS was widely distributed and subject to public hearings and comment. The ROD subsequently issued after the close of the public comment period for the FEIS contained the FHWA's final decision that the crossing would be publicly owned. Comments received on the FEIS after the Notice of Availability were published in the Federal Register on December 5, 2008 are reflected in the ROD.

concluded at the end of the process that government ownership, in partnership with private-sector entities, struck the best balance among the governance options, environmental considerations, purpose and needs of the DRIC project. ROD pp. 12-17, DRIC916091-096.

Based on this record, the court cannot conclude that the FHWA's decision that the DRIC would be publicly owned violated NEPA or was arbitrary, capricious, or an abuse of discretion.

C.     FHWA's Elimination of Illustrative Alternative X-12 did not violate NEPA

The Bridge Company contends on appeal that the FHWA acted arbitrarily and capriciously by simply "acceding to Transport Canada's demands to eliminate X-12 from consideration" rather than giving X-12 a "hard look" as required by NEPA. However, the administrative record reflects that the FHWA did not simply defer to Canada and that there were a variety of reasons that Illustrative Alternative X-12 was not advanced as a Practical Alternative.

1. FHWA's consideration of Canada's position on X-12 does not violate NEPA

The Bridge Company argues on appeal that the FHWA merely accepted Canada's desire not to pursue Illustrative Alternative X-12 due to environmental impacts and community disruptions in Windsor without making an independent analysis of Canada's assessment, and that this failure violates NEPA. In support of this position, the Bridge Company points to a string of cases holding that the agency responsible for NEPA compliance may not abdicate its NEPA responsibilities to others and can only rely on the work of consultants and others if the responsible agency independently reviews and verifies the data. While the Bridge Company's recitation of the law may be correct, it is inapplicable to this case. Further, a review of the record reflects that the FHWA did not simply rubber-stamp Canada's objections to X-12.

All Illustrative Alternatives were separately evaluated by the United States and Canadian DRIC teams based on criteria established by the Partnership. The Partnership Steering Committee met in October 2005 to discuss the outcome of those evaluations and the narrowing of alternatives under consideration to a smaller set of Practical Alternatives for further study.

Based on the Partnership evaluation criteria, the Canadians ranked X-12 poorly as a crossing candidate due to negative community and environmental impacts on Canadian shores which were more significant than the impacts of other Illustrative Alternatives. FEIS 2-14 and 2-15. A lengthy discussion followed "on the analysis and whether one side could leave it in while the other did not." DRIC111768. At the end, "[t]he conclusion was the Canadian side would go back and do more study to evaluate the issue." *Id.*

Another meeting took place over a week later on November 3, 2005. At that meeting, "the Canadian side indicated that their further analysis indicated that to meet the purpose and need of freeway-to-freeway connection they would need to totally rebuild Huron Church Road to a freeway plus some local access and it would cause major damage to the hotels, business and Windsor University which front onto Huron Church. Also the expansion of the Canadian plaza would cause severe neighborhood damage to the surrounding area. For these reasons, [the Canadians] did not see the twinning of the Ambassador Bridge [X-12] to be a practical alternative." *Id.*

The United States technical team and the Steering Committee agreed with the Canadian analysis. *Id.* The FHWA's evaluation of Canada's position on X-12 concluded that Canada's assessment was "consistent with agreed evaluation criteria" and that Canada "correctly identified significant community disruption and environmental impacts" associated with X-12 plazas and roadway-freeway connections. DRIC014802. Whether or not an independent analysis of Canada's position was required, the FHWA made its own evaluation and determined that the Canadian evaluation was based on the agreed criteria and was correct in its conclusions.

The Bridge Company also claims that the eight day period of "further study" was insufficient time to conduct a legitimate review. However, at the time further consideration of Canada's position on X-12 was called for, both sides had already conducted extensive studies of the Illustrative Alternatives, and any additional review would have built on that foundation.

As discussed below, the FHWA had its own reasons for not advancing X-12 as a Practical Alternative. But even if it did not, Canada's firmly stated objections presented the

FHWA with a unique problem. Illustrative Alternative X-12 could not be built without Canada's agreement, which was unlikely under the circumstances.

NEPA does not require the FHWA to pursue alternatives that present unique problems, or are impractical or infeasible. *Busey,* 956 F.2d at 627 (Feasible alternatives may be rejected without violating NEPA if they present "unique problems.") (citing *Citizens to Preserve Overton Park*, 401 U.S. at 413); *Northern Alaska Environmental Center v. Kempthorne*, 457 F.3d 969, 978 (9th Cir. 2006) (NEPA does not require consideration of alternatives that are not feasible); *Lovgren v. Locke*, 701 F.3d 5, 37 (1st Cir. 2012). Further, it is not a violation of NEPA for an agency to decline to consider further an alternative if the agency is unlikely to secure required approval to move forward with that alternative. *Natural Resources Defense Council, Inc.* v. F.A.A., 564 F.3d 549, 557 (2d Cir. 2009) ("We cannot conclude that the FAA abused its discretion in declining to consider alternatives that would affect Goose Bayou. . . . [T]he Florida DEP viewed projects affecting [Goose Bayou] as unacceptable . . . . Thus the FAA reasonably concluded that projects affecting Goose Bayou did not present workable alternatives because they were unlikely to secure permit approval from the Florida DEP.") (citing *Vermont Yankee Nuclear Power Corp.*, 435 U.S. at 551). The FHWA could not force Canada to give its approval to build X-12.

Accordingly, we conclude that the FHWA's consideration of X-12's impacts in Windsor, Ontario as a factor in determining not to advance X-12 as a Practical Alternative was not an abuse of discretion and not a violation of the FHWA's responsibilities under NEPA.

2. FHWA had its own reasons for not advancing X-12 as a Practical Alternative

When the FHWA evaluated X-12 against the agreed-upon criteria, X-12 ranked "first in the following categories: Community Neighborhood Impacts, Consistency with Local Planning and Protecting the Natural Environment." DRIC001938. However, X-12 was not the perfect alternative on the United States side. Although X-12 ranked high in some categories, it ranked almost last in other categories, namely Air Quality and Protecting Cultural Resources. Further, X-12 did not satisfy DRIC project needs with respect to efficiency via freeway-to-freeway access

and system availability through redundancy.    DRIC014357-58; DRIC001938; *see also* DRIC001960 *et seq.*

The Bridge Company claims that the redundancy factor was an *ex post facto* creation by the FHWA to justify elimination of X-12.    However, the AR is clear that crossing system redundancy was identified early in the process as a necessary component to accomplishing the DRIC project purposes of adequate vehicle capacity, economic and national security, operational efficiencies, and crossing reliability.    FEIS 1-1 – 1-14.    The concept of redundancy encompasses plaza and highway connections in addition to the crossing itself.    Two bridges side-by-side that share plazas and/or access provide only limited redundancy because an incident on an access road or plaza could shut down both bridges.    "A new crossing at a different location, with separate inspection plazas and new connections to the freeway network in both countries, would provide a second, distinct crossing system and a greater degree of redundancy."    FEIS 1-14, DRIC014344.

While Illustrative Alternative X-12 was highly ranked by the FHWA in some categories, it ranked poorly in others, including providing a redundant system.    All that is required by NEPA is that is that the agency conduct a thorough review and take a "hard look" at the alternatives and "briefly explain" its reasons for eliminating one alternative over the other.    NEPA does not require that certain factors–even environmental considerations–be weighed more heavily by the FHWA than other factors.    If adverse environmental impacts are adequately identified and evaluated, NEPA does not constrain the FHWA from deciding that other project values outweigh the environmental costs.    *Natural Resources Defense Council,* 564 F.3d at 556.

Our review of the record reflects that the FHWA complied with NEPA's procedural requirements.    The FHWA evaluated X-12 and all of the Illustrative Alternatives against the established criteria, assessed environmental impacts and project objectives, disclosed those impacts and objectives to the public, determined not to advance X-12 as a Practical Alternative in the DRIC project, and explained its reasons for doing so.    Based on the record, it cannot be held that the FHWA's decision not to advance X-12 as a Practical Alternative was unreasonable, arbitrary and capricious, or an abuse of discretion.

D.    FHWA's consideration of "no build" alternatives did not violate NEPA

Consideration of "no build" or "no action" alternatives, along with "build" alternatives, is required by NEPA.  Appellants contend that the FHWA incorrectly identified the "no build" alternative variation and, as a consequence, violated NEPA by failing to compare the "correct" "no build" alternative to the Practical Alternatives.  Certain background information is necessary to understand the issues surrounding the "no build" alternative variation.

Appellant Bridge Company owns and operates the existing Ambassador Bridge between Detroit and Windsor, which was constructed pursuant to a 1921 federal statute.  The Ambassador Bridge is a four-lane bridge–two lanes in each direction.  As might be expected of a bridge that age, the Ambassador Bridge has maintenance and repair issues, sometimes resulting in lane closures.

The Bridge Company has proposed to build a second span to the Ambassador Bridge which would consist of six lanes of traffic.  Their plan is that the new six-lane bridge would connect to the Ambassador Bridge's existing plazas in Detroit and Windsor.

In a letter dated August 3, 2005 to counsel for the Bridge Company, the United States State Department acknowledged that the replacement or expansion of the Ambassador Bridge would not require a Presidential Permit.  DRIC124512-13.  Although the construction of a second span would not require a Presidential Permit, such construction is not exempt from any other requirements of United States law, including approval of plans by the Department of Homeland Security.  Further, any required agreements between the Bridge Company and the State of Michigan and Canada would have to be approved by the Secretary of State.  *Id.*

The "no build" alternative considered by the FHWA included the possibility of a new six-lane bridge privately built by the Bridge Company.  An environmental assessment submitted by the Bridge Company to the United States Coast Guard regarding the possible new bridge states that after the new six-lane span was completed, the Ambassador Bridge would be taken out of

service to make repairs and when necessary repairs were complete, the bridge would be reopened for pedestrian and bicycle traffic.[15]  FEIS 3-218, DRIC014615.

However, the Bridge Company contends on appeal that the FHWA's "no build" alternative considered the wrong scenario, thereby violating NEPA.  The Bridge Company argues that the FHWA arbitrarily and capriciously and erroneously considered a "no build" scenario in which the existing four-lane Ambassador Bridge would be taken out of service after the new six-lane second span was completed, resulting in a net gain of only two lanes.

According to the Bridge Company, the correct "no build" alternative that the FHWA should have considered is the proposed new six-lane second span to the Ambassador Bridge plus the existing four lanes of the Ambassador Bridge.  If both the Ambassador Bridge and new six-lane bridge were open to vehicular traffic, there would be a net gain of six lanes, which the Bridge Company contends completely obviates the need for the DRIC bridge.  The Bridge Company discounts its representations to the United States Coast Guard that the Ambassador Bridge would be taken out of service for vehicular traffic because the Bridge Company has also made statements that the Ambassador Bridge would be "available for use if circumstances warrant" (DRIC020110) and the "Ambassador Bridge *may* make the existing span's four lanes available when circumstances so demand" (DRIC071774) (emphasis added).

The Bridge Company's contention that the FHWA violated NEPA by considering a six-lane "no build" alternative rather than a ten-lane "no build" alternative is wrong.  First, what alternatives will be considered is a determination for the agency to make.  *See Vermont Yankee*, 435 U.S. at 551.  NEPA does not dictate the nature of the alternatives that must be considered by the FHWA.  Second, the Bridge Company's own statements regarding the future of the Ambassador Bridge are vague, ambiguous, and inconsistent with respect to when and how many

---

[15]"Once the new structure is completed, the existing Ambassador Bridge will be taken out of service to effect repairs that are deemed necessary. Once any repairs are completed, the existing structure will be used to provide for bridge internal operational needs and also to provide pedestrian and bicyclist amenities . . . .
    The purpose of the Ambassador Bridge Enhancement Project is to remove traffic from an aging structure without interrupting service between the United States and Canada.  The *intent is to maintain the capacity of the current crossing* and to improve the efficiency of the crossing by providing dedicated lanes restricted to low risk truck travel . . . . *Unlike the purpose of the Ambassador Bridge Enhancement Project, the purpose of the DRIC Study is to investigate alternatives for additional capacity needs in the future.*"  DRIC130149, DRIC130168, DRIC130177 (emphasis added).

lanes of traffic would actually be available if the Bridge Company constructed the new six-lane bridge. The FHWA could not reasonably be expected to rest its analysis of a "no build" alternative on assumptions and likelihoods and inconsistent statements from the Bridge Company about what it might–or might not–do with the Ambassador Bridge in the future. Even if the Bridge Company stated with certainty that the Ambassador Bridge would remain open to vehicular traffic, there is no certainty that the second span would be built at all, given the many agreements, permits, and approvals required, and numerous other factors. Based on the AR, it was not unreasonable or an abuse of discretion for the FHWA to assume that the proposed privately built six-lane second span would replace the existing four lane Ambassador Bridge when defining the specifics of a "no build" alternative.

The "no build" alternatives were extensively evaluated by the FHWA against the "build" alternatives. First the FHWA determined that the "no build" alternatives would not provide sufficient long-term crossing capacity. Second, relative impacts of the "no build" alternatives were evaluated against the practical alternatives in the following categories: community, environmental justice, jobs and economy, land use, non-motorized transportation and bus service, air quality, noise, wetlands, archaeological resources, above-ground resources, cultural resources, parkland impacts, visual landscape, contaminated properties, soils and geological resources, permits, long-term productivity, irretrievable commitment of resources, lighting, and safety and security. FEIS, Section 3. The "no build" alternatives and practical alternatives were also evaluated and compared with respect to indirect impacts, cumulative impacts, and trans-boundary impacts. FEIS 3-191; 221-23, and 229.

Based on this extensive review, the court concludes that the FHWA took the requisite "hard look" at the "no build" alternative as required by NEPA, and was not arbitrary and capricious in its decision to eliminate the "no build" alternative in favor of the Preferred Alternative to accomplish the DRIC project's purpose and needs.

E.    FHWA's use of traffic projections did not violate NEPA

The Bridge Company claims on appeal that the FHWA violated NEPA by failing to take a "hard look" at current traffic data, which the Bridge Company argues contradicts the early

traffic forecasts upon which the FHWA relied for the DRIC project. In the initial stages of the DRIC project, the traffic forecasts utilized were from a September 2005 Travel Demand Forecast Working Paper prepared by the IBI Group, which relied on actual traffic data through 2004, and regional traffic studies that projected a range of increasing traffic volume and the need for increased capacity over the next three decades. FEIS 1-9 – 1-10, DRIC014339-340; DRIC01532-33.

Traffic forecasts generated early in a project process will inevitably age as the lengthy process of a bridge project unfolds. The FEIS was issued in 2008. By that time, updated traffic data was available for 2005 – 2007. The Bridge Company argues that the current data projected lower increases in traffic volume than initially predicted, thereby undermining the DRIC project need for increased capacity. DRIC071774-75. The Bridge Company claims that the FHWA violated NEPA by failing to use updated traffic data in its final decision making, and by failing to disclose the updated traffic data to the public in the FEIS.

However, the record reflects that the FHWA considered both initial and updated traffic data and forecasts. *See e.g.* DRIC060992-996; DRIC082258-6; DRIC059421. Contrary to the Bridge Company's contention, the FHWA did not ignore current actual data, but extensively evaluated that information in the context of the DRIC project's purpose and needs, earlier projections, and factors affecting traffic volume. *Id.*

Traffic forecasts from the initial stage of the project predicted a range of increased traffic volume. Traffic projections from the later forecasts continued to predict increasing traffic volume, and the projected increase in volume fell near the lower end of the original projected range. DRIC060992-995; DRIC003818. The FHWA and the Partnership specifically addressed the question of "freshening" the base year from 2004 to 2007. However, after evaluating both the original data and the new data, the FHWA concluded that the new data introduced no changes that altered the basic assumptions underlying the DRIC project, and that independent traffic forecasts supported DRIC models and the continuing validity of those models. *Id.*; DRIC129273; DRIC057025.

The record reflects that the updated traffic data and its effect on the DRIC project was specifically considered by the FHWA. Further, traffic capacity was not the only justification for additional crossing capacity. Economic security, national security, redundancy and connectivity were also purposes and needs for the DRIC project identified by both the United States and Canada. DRIC060992-995. This extensive consideration constitutes a "hard look" at the data and overall circumstances driving the DRIC project, and it was not unreasonable for the FHWA to conclude that the new data did not support a change in the direction of the DRIC project or inclusion in the DRIC project analysis in the FEIS.

The Bridge Company may disagree with the FHWA's conclusions regarding the effect of the updated traffic data on the DRIC project. However, appellant has not demonstrated that the FHWA's consideration of the updated forecasts and decisions regarding the new traffic data violated NEPA or was arbitrary and capricious or an abuse of discretion.

F.    The District Court did not abuse its discretion in denying the Bridge Company's motion
      to supplement the Administrative Record.

The Bridge Company contends on appeal that the district court improperly denied its motion to supplement the administrative record with a traffic study commissioned by Transport Canada and certain Canadian documents. Specifically, the Bridge Company claims that the administrative record is incomplete because it does not include: 1) an Investment Grade Traffic Forecast (IGTF) commissioned by Transport Canada; and 2) documentation relied on by Canada to reject alternative X-12, which the Bridge Company contends shows Canada's bias against the Bridge Company and its second span.

    1. Investment Grade Traffic Forecast

The AR reflects that the IGTF was commissioned by the Canadian government, not the Partnership or the FHWA, as part of Canada's internal analysis of how to fund Canada's portion of the DRIC project. The purpose of this traffic forecast was to determine if the new crossing would generate sufficient toll revenue to make it attractive to investors, and was entirely different from the traffic and travel demand models used by the Partnership to evaluate project purposes and needs. DRIC005068-69; DRIC003818.

The IGTF was discussed at a meeting on October 23, 2008 between the FHWA and the MDOT to review the preliminary FEIS. The relevant portion of the meeting notes reflects the following: "The Investment Grade Traffic Forecast (IGTF) was discussed. It is an effort of the Canadian government to determine how to finance the project. It is proprietary. Mr. Steele will not use the IGTF as a part of his basis to sign the Record of Decision." DRIC005037. Not only was the IGTF not used by the FHWA as a basis for the ROD, but it was not provided to DRIC project consultants and not used to develop traffic forecasts for the DRIC project or otherwise integrated into the FEIS. DRIC124546.

The Bridge Company contends on appeal that it was arbitrary and capricious for the FHWA not to consider the IGTF, and that even if the FHWA completely ignored the IGTF, it should nevertheless be included in the AR and the district court abused its discretion in refusing to supplement the AR with the IGTF. The court disagrees.

The IGTF was not a study commissioned by the FHWA or Partnership for the DRIC project, but a proprietary document commissioned by the Canadian government for the purpose of determining how Canada would meet its financial responsibilities for the DRIC project, not whether or how the DRIC project should proceed. Further, the IGTF was not the only source of updated traffic data; updated traffic data was available from other studies and that data was thoroughly considered by the FHWA as discussed, *supra*. The FHWA's decision not to include the IGTF in the AR was not arbitrary or capricious or an abuse of discretion.

Further, the Bridge Company has not met its burden of establishing any of the reasons which would support supplementation of the AR with the IGTF, or established that the AR without the IGTF is "inadequate for an assessment of their claims." *Slater*, 120 F.3d at 639. For all these reasons, the court concludes that Judge Cohn did not abuse his discretion in denying plaintiffs' motion to supplement the AR with the IGTF.

2. Canadian Documents

The Bridge Company further contends on appeal that the district court abused its discretion when it refused to supplement the AR with documents that the Bridge Company claims would shed light on the motive behind Canada's stated reasons for not advancing

Illustrative Alternative X-12 as a Preferred Alternative. The Bridge Company also argues that by failing to consider Canada's motives regarding X-12, the FHWA did not take a "hard look" at X-12 as required by NEPA. We disagree on both points.

First, to the extent that the Canadian documents at issue post-date the FHWA's ROD, the FHWA could not have considered them during the DRIC process. Reviewing courts do not normally consider materials outside of the record in an administrative appeal. *See Overton Park*, 401 U.S. at 416. Second, the Bridge Company failed to establish any exceptional circumstances that would warrant consideration of extra-record documents, or demonstrate that without these documents the AR is inadequate to assess appellants' claims.

Canada's motives aside, the AR reflects that FHWA verified the objective impacts of X-12 on Canada's shores. On the United States side, the FHWA identified multiple areas in which X-12 received low scores on the criteria developed by the Partnership for assessing Illustrative Alternatives and did not satisfy certain of the DRIC project's purposes and needs.

For all of these reasons, the court concludes that the district court did not abuse its discretion in refusing to supplement the record with Canadian documents that the Bridge Company claims reveals Canada's "motives" regarding crossing X-12.

G.     The FHWA did not violate principles of Environmental Justice

Appellant Community Group Defendants claim that the FHWA violated environmental justice principles by failing to give a "hard look" at alternative bridge crossings that would not have a negative impact on the minority and low-income neighborhood of Delray. According to the Community Group Defendants, Illustrative Alternatives X-1 through X-9 (the "Downriver" sites) are predominantly affluent white neighborhoods west of Detroit and were improperly eliminated due to political pressures.[16]

---

[16]The Community Group Appellants also contend that the FHWA failed to give Illustrative Alternative X-12 a "hard look" before that alternative was eliminated as a Preferred Alternative. For the reasons discussed, *supra*, the court concludes that the FHWA gave Illustrative Alternative X-12 a "hard look" as required by NEPA.

Assuming for the purpose of this analysis only that the Community Group Defendants have a right to bring an environmental justice challenge under NEPA, the court concludes that the FHWA satisfied its environmental justice obligations. The claim of the Community Groups that the FHWA predetermined the DRIC location in Delray and failed to take a 'hard look" at community impacts and other alternatives is not supported by the AR.

Community impacts on minority populations were part of DRIC project considerations even at the scoping phase. DRIC001205. All Illustrative Alternatives, including the Downriver sites, were evaluated in accordance with seven criteria established by the Partnership, which included community impact. Evaluation of Illustrative Alternatives took place from March to May 2005. The result of these evaluations was available in September 2005, preceding any announcement that Downriver sites would not be advanced as Practical Alternatives. DRIC005443; DRIC016482

The Downriver sites, crossings X-8 and X-9, and the Belle Isle crossings were not considered practical alternatives for a variety of reasons, including the presence of old mining sites, poor performance in regional mobility rankings, and significant community impacts on both sides of the river. DRIC08120; DRIC008147-50. The Downriver alternatives scored in the bottom half of Illustrative Alternative evaluation factors for community impact, consistency with local planning, protecting natural resources, improving regional mobility, and constructability. DRIC008122-23.[17] Further, other crossing alternatives considered by the FHWA had higher concentrations of low income and minority populations than Delray. DRIC 003364; DRIC127610. The impacts of crossing X-10 were compared to the "no build" alternative, as were all alternatives. FEIS ES 28-29.

Further, the FHWA conducted a study and prepared an extensive community inventory report to fully understand and minimize community impacts in the Delray area, which were disclosed throughout the NEPA study process. DRIC006838; FEIS 3-34 – 3-37. Mitigation and minimization of community impacts were identified and documented. FEIS 37-38;

---

[17]Evaluations of the Downriver sites ranked in the bottom half among the alternatives in weighted scores of both citizens and the FHWA. DRIC008127.

DRIC016129-133. Community leaders and organizations from the southwest Detroit area and the Delray Community Council urged the Michigan legislature to continue to support the DRIC project because of the project's importance to the economic growth of the region. DRIC130081-82.

The Executive Order requires the FHWA to consider alternatives to avoid or minimize disproportionately high adverse impacts on minority populations. Just as the FHWA is not required to select an alternative with the least environmental impact under NEPA, the FHWA is not required to select an alternative with the least environmental justice impact. NEPA requires only that the FHWA consider the environmental impacts of its projects in making its decisions.

The FHWA did just that. After exhaustive study and consideration of environmental justice issues, the FHWA selected a Preferred Alternative that the FHWA determined best fulfilled the DRIC project's purpose and needs. Environmental impacts and environmental justice issues are a consideration in agency decision making, but are not controlling. The record amply reflects that the FHWA took a "hard look" at both these issues, considered the "no build" alternatives throughout the entire process, reasonably determined its priorities based on all the comparative information available, and made a choice that resulted from a reasoned process. There is nothing in the record that reflects that the FHWA's selection of the Preferred Alternative X-10B violated principles of environmental justice or was arbitrary, capricious, an abuse of discretion, or contrary to law.

## VI. CONCLUSION

For these reasons, the district court's order denying appellants' motion to supplement the Administrative Record is AFFIRMED. Further for the reasons contained herein, the district court's final order affirming the ROD is AFFIRMED.