RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 16a0070p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

SOUTHERN FOREST WATCH, INC.; JOHN WALTON
QUILLEN; EARL ROB CAMERON; GREGORY D.
BOSTICK,

         *Plaintiffs-Appellants*,

         *v.*

SALLY JEWELL, Secretary of the Interior, et al.,
         *Defendants-Appellees*.

No. 15-5413

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:13-cv-00116—Thomas W. Phillips, District Judge.

Argued:  December 3, 2015

Decided and Filed:  March 23, 2016

Before:  DAUGHTREY, COOK, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  J. Myers Morton, MORTON & MORTON, PLLC, Knoxville, Tennessee, for Appellants.  Robert P. Stockman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.  **ON BRIEF:**  J. Myers Morton, MORTON & MORTON, PLLC, Knoxville, Tennessee, for Appellants.  Robert P. Stockman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees.

---

**OPINION**

---

HELENE N. WHITE, Circuit Judge.   Southern Forest Watch, Inc. and three individual plaintiffs ("SFW," collectively) appeal the grant of summary judgment to the U.S. Department of the Interior, the National Park Service, and four officials (the "Park Service," collectively), in this action challenging a new fee at Great Smoky Mountains National Park.   SFW argues that the Park Service failed to comply with the Federal Lands Recreation Enhancement Act (FLREA), 16 U.S.C. § 6801 *et seq.*, when it imposed the fee.   SFW also contends that the district court erred in denying a motion to order discovery outside the administrative record.   We **AFFIRM**.

**I.**

Great Smoky Mountains encompasses more than 500,000 acres of public lands in Tennessee and North Carolina.   Visitors can hike and camp in the park's backcountry, which includes parts of the Appalachian Trail.   In the years leading up to the new fee, Great Smoky Mountains required backcountry visitors to register with the park and obtain a permit.   Some of the campsites also required reservations, which the park managed through third-party software called Wilderness Trakker.   In May 2010, the park received notice that technical support for Wilderness Trakker would be discontinued.   Park staff convened a task force to investigate alternatives and decided to pursue an online reservation system.   The task force mapped out the likely costs and discussed funding the online system through a new fee for backcountry permits and reservations.   In May 2011, park management sent a memorandum to their superiors at the Park Service's southeast regional office in Atlanta seeking permission to begin the public-engagement process for imposing a new fee.   The regional office requested and received approval from the agency's national leadership in Washington, D.C., in June 2011.

The park then developed a public-engagement plan for the new fee, emphasizing the expected improvements in trip planning, campsite reservations, and customer service in the park's backcountry office.   Park staff planned to contact congressional delegations, local officials, chambers of commerce, and local partners.   On July 27, 2011, the park issued a

proposal for circulation to local stakeholders explaining the new fee and the rationale for it, including complaints about the reservation system, public desire for more rangers in the backcountry, and overcrowding at sites without a reservation system. The proposal invited written comments and advertised two open houses. Great Smoky Mountains also issued a press release on July 29, announcing the potential changes, and another on August 8, inviting the public to open houses to be held on August 16 and 18. The park received 230 written comments, and sixty-nine persons attended the open houses. An internal analysis of the public feedback noted general opposition to fees, concern about the use of an outside contractor to manage the reservation system, and differing views about the need for additional backcountry management by rangers.

Great Smoky Mountains decided to move forward with the new fee and developed an implementation plan in November 2011. The park would charge four dollars per person, per night at 101 backcountry campsites and shelters beginning on January 1, 2013. The implementation plan summarized the public-engagement process, including the press releases, open houses, written comments, and phone calls to local stakeholders. The plan acknowledged the broad public opposition to the fee—"more comments expressed general opposition or specific concerns than support for the proposal"—but suggested that "most issues of concern that go beyond the philosophical issue of imposing any fee can be satisfactorily addressed in the design of a reservation system and its subsequent implementation." R. 39-2, PID 536–37. The regional director approved the implementation plan and submitted it to the Washington office.

After the Washington office expressed concerns about negative feedback from the public, Great Smoky Mountains issued a new briefing on its proposal that further explained its public-engagement efforts. The park described the concerns expressed in the 230 written comments, including general opposition to the imposition of a fee, skepticism about the reservation system, and principled objections to fees on the Appalachian Trail. The park superintendent also followed up with the regional director to report that contacts with the local congressional delegations revealed no significant opposition. The Washington office approved the fee, and Great Smoky Mountains announced the new fee in a news release on March 7, 2012.

SFW then brought this action challenging the new fee.  SFW filed a motion to open discovery to supplement the administrative record, which the district court denied without prejudice.  SFW then moved for a declaratory judgment and renewed its request for discovery, and the Park Service moved for summary judgment.  The district court denied SFW's request to open discovery and granted the Park Service's motion for summary judgment.

## II.

SFW argues that the Park Service failed to comply with the Federal Lands Recreation Enhancement Act (FLREA), 16 U.S.C. § 6801 *et seq.*, and further challenges the fee under the Administrative Procedure Act (APA), 5 U.S.C. § 706.  We review de novo the district court's grant of summary judgment, *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013), and will set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A).

The FLREA authorizes the Department of the Interior to "establish, modify, charge, and collect recreation fees at Federal recreational lands and waters," 16 U.S.C. § 6802(a), sets criteria for establishing and changing recreation fees, *id.* §§ 6801, 6802(b), and requires public notice and participation in the development of new fees, *id.* § 6803.  The statute imposes additional procedural requirements when an agency establishes a "new recreation fee area." *Id.* § 6803(b)–(c).  SFW argues that the Park Service violated (1) the rules for new fee areas, (2) the public-participation requirement, and (3) the public-notice mandate.  We disagree.

## A.

The Park Service must "publish a notice in the Federal Register of the establishment of a new recreation fee area . . . 6 months before establishment." 16 U.S.C. § 6803(b).  SFW argues that the backcountry fee created a new recreation fee area without the required notice in the Federal Register.  The Park Service does not assert it complied with the notice provision; rather, it contends the provision is not applicable because although the backcountry fee was a "new fee,"

Great Smoky Mountains was not a "new recreation fee area."[1] The FLREA does not define "new recreation fee area." *See* 16 U.S.C. § 6801. SFW argues that "new recreation fee area" means any park that establishes a fee under the FLREA for the first time. The Park Service contends that "new recreation fee area" does not apply to parks that previously charged fees. The parties appear to agree that the "fee area" in question is the park as a whole, and that Great Smoky Mountains charged recreation fees before and after the FLREA took effect. Thus, the dispute is limited to whether Great Smoky Mountains became a "new" recreation fee area when it sought to establish the new backcountry fee under the FLREA.

Congress did not explain the term "new recreation fee area," and the legislative history offers little, if any, additional insight into Congress's intended meaning. *See* H.R. Rep. No. 107-790 (2004); S. Rep. No. 108-233 (2004). Neither the statute nor the legislative history addresses pre-existing fees or pre-existing fee areas; the statute merely repeals prior fee-authorizing statutes and states that fees charged under the FLREA are in lieu of those charged for the same purposes under other provisions of law. 16 U.S.C. §§ 6812–13. There is no textual support in the FLREA for the view that the statute's effective date determines when a recreation fee area is "new." Nor is this a natural reading based on the history of park fees. The Park Service has collected fees since its inception, and Congress granted the agency broad fee-collection authority in the Land and Water Conservation Fund Act of 1965 (LWCFA), Pub L. No. 88-578, 78 Stat. 897 (Sept. 3, 1964), which was followed by the Recreational Fee Demonstration Program, Pub. L. No. 104-134 § 315, 110 Stat. 1321-200 (Apr. 26, 1996), and then by the FLREA, Pub. L. No. 108-447, 118 Stat. 3390 (Dec. 8, 2004). SFW's interpretation of § 6803(b) to mean that well-established fee areas become "new" again the first time they seek to impose a new fee after the FLREA's effective date is inconsistent with this history.

The Park Service relies on its internal guidance documents as authoritative. Statutory interpretations in agency guidance documents are "'entitled to respect,' . . . but only to the extent that those interpretations have the 'power to persuade.'" *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Neither party

---

[1]The Park Service also argues that SFW did not adequately raise this issue in its opening brief. Although the argument was not developed, SFW asserted that the backcountry fee created a new fee area and alluded to the Federal Register requirement. We decline to deem the issue waived.

discusses the language of the guidance documents, which is not entirely clear.[2]  In any event, the interpretation of the FLREA the Park Service advances before this court is persuasive,[3] and to the extent the agency's own guidance documents may suggest a different view, we find them unpersuasive.  Thus, because the park was charging recreation fees when it sought to impose the backcountry fee, Great Smoky Mountains was not a new recreation fee area subject to the requirements of § 6803(b).

**B.**

Still, other FLREA requirements apply to any new fee, even when the park has previously charged fees.  The Park Service must "provide the public with opportunities to participate in the development of or changing of a recreation fee."  16 U.S.C. § 6803(a).  The statute offers no further direction on what constitutes an "opportunity to participate," *see id.* § 6801, but the Park Service's internal fee-collection manual, Reference Manual 22A: Recreation Fee Collection ("Manual 22A"), provides detailed steps for parks to follow.  SFW relies heavily

---

[2]The Park Service has a three-tiered system of guidance documents:  Management Policies articulate service-wide policy statements, Director's Orders prescribe more specific standards, and lower-tier documents—including reference manuals and handbooks—supply day-to-day operational instructions.  In May 2010, the Park Service approved Director's Order 22, which stated:  "If a new fee area is established (i.e., a park has never charged a fee under the FLREA), the park must coordinate with the regional manager to publish notice in the Federal Register six months before the new fee is implemented."  In April 2011, the Park Service issued an internal fee-collection manual for employees, titled Reference Manual 22A: Recreation Fee Collection ("Manual 22A"), which defined the term:  "A park that has never charged an entrance or an expanded amenity fee using the FLREA and decides to begin charging is establishing a new fee area."  The Park Service asserts that Manual 22A "explain[s] that parks that previously charged fees are not new recreation fee areas," Gov't Br. 19–20 n.2, but the inclusion of the qualifying language "under the FLREA" and "using the FLREA" can be read as supporting SFW's position.  Although the Park has been charging recreation fees since before the FLREA was enacted, those recreation fees were imposed under prior law; the backcountry fee is apparently the first expanded amenity fee imposed "under" the FLREA.

On the other hand, the Park Service's guidance documents can also be construed to assume that any recreation fee initially imposed under prior law would effectively become a fee charged "under" or "using" the FLREA.  Manual 22A provides in an earlier section that:

> Whether [a] park already collects fees or is considering it, [the park] must ask if the collection of fees will enhance services or otherwise benefit park visitors.  In addition, all park fee programs must meet the criteria of the [FLREA], and the NPS guiding principles for fee programs . . . . Both prospective and existing park fee programs should complete a cost: benefit analysis . . . .

R. 72-1, PID 1440.  Apparently, the Park Service understood its existing recreation fee programs to be governed by the FLREA after it took effect, and any existing fees would therefore be charged "under" or "using" the FLREA.

[3]It is unclear whether the Park Service's interpretation of "new recreation fee area" would include a park that charged fees under prior legislative authority but charges no fees at the time it proposes a new fee, and we express no opinion.

on the manual to argue that the Park Service failed to comply with the statute, and the parties dispute whether the manual's rules are binding. SFW also claims that the Park Service denied the public an opportunity to participate in the process by misrepresenting the fee's justification.

**1.**

As a general matter, "agencies are bound to follow their own regulations," *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545 (6th Cir. 2004), but "[i]nternal operating manuals . . . do not carry the force of law, bind the agency, or confer rights." *Reich v. Manganas*, 70 F.3d 434, 437 (6th Cir. 1995) (holding that a Social Security Administration manual did not have the force of law); *see also Valen Mfg. Co. v. United States*, 90 F.3d 1190, 1194 (6th Cir. 1996) (holding that an Internal Revenue Service manual did not have the force of law). Although this general principle does not foreclose the possibility that a manual could contain rules carrying the force of law, *see, e.g.*, *Atrium Med. Ctr. v. U.S. Dep't of Health & Human Servs.*, 766 F.3d 560, 571–73 (6th Cir. 2014), we conclude Manual 22A is not binding.

First, the Park Service did not publish Manual 22A in the Federal Register or the Code of Federal Regulations, and any substantive rules the manual contains did not go through the appropriate procedures for agency rulemaking. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203–04 (2015). Under the APA, agencies must follow the notice-and-comment process before issuing binding, legislative rules. 5 U.S.C. § 553(b)–(c); *Perez*, 135 S. Ct. at 1203. In contrast, nonlegislative "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice"—which lack the force and effect of law—are not subject to notice and comment. 5 U.S.C. § 553(b)(A); *Perez*, 135 S. Ct. at 1204. SFW claims that any rules in Manual 22A are substantive and binding, but if that is the case, the rules likely would be invalid for failure to comply with the APA.

Further, the Park Service did not intend for Manual 22A to be binding. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172–73 (2007). Although the manual at times uses mandatory language, the stated intention of the manual's public-participation rules is to "[a]ssist parks in complying with legal public participation requirements." R. 72-1, PID 1688. Additionally, in a Director's Order, the Park Service explained that "all components of the NPS

directives system," including manuals, are "intended only to improve the internal management of the NPS and [are] not intended to, and do[] not, create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." R. 76-2, PID 1756. In other words, the Park Service adopted these policies as a management tool to facilitate FLREA compliance, not to create additional obligations beyond the statutory mandates.

Lastly, SFW argues that Manual 22A must be binding because it was issued pursuant to the FLREA. This argument is misplaced. The FLREA mandates the promulgation of public-participation guidelines "[b]efore establishing any new recreation fee area," 16 U.S.C. § 6803(c), but the Secretary of the Interior addressed this obligation by publishing broadly applicable guidelines in the Federal Register after the FLREA took effect. *See* Notice of Guidelines for Public Involvement in Establishing Recreation Fee Areas and for Demonstrating How the Public Was Informed on the Use of Recreation Fee Revenues, 70 Fed. Reg. 56,622-02 (Sept. 28, 2005). These guidelines require agencies like the Park Service to include "[d]etailed guidance on public involvement" in their manuals, *id.* at 55,623, but nothing more than guidance. And, as discussed, even if § 6803(c) did require the Park Service to create binding rules, this provision only applies to new fee areas—a category that does not include Great Smoky Mountains.

Our conclusion that Manual 22A does not create legally enforceable rules is in line with other courts that have addressed challenges arising under Park Service guidance documents. In *Wilderness Society v. Norton*, 434 F.3d 584 (D.C. Cir. 2006), the D.C. Circuit considered whether the Park Service's 2001 Management Policies created legal obligations. The court found that that these policies constituted "a nonbinding, internal agency manual intended to guide and inform Park Service managers and staff," and were not "judicially enforceable at the behest of members of the public who question the agency's management." *Id.* at 596. The Ninth Circuit reached a similar conclusion in *River Runners for Wilderness v. Martin*, 593 F.3d 1064 (9th Cir. 2010), and explained that "the 2001 Policies are not enforceable against the Park Service" because they "do not prescribe substantive rules." *Id.* at 1070–73. As the Park Service points out, the 2001 Management Policies have a greater degree of authority than Manual 22A, a relatively low-level fee-operations manual.

**2.**

SFW suggests it would be arbitrary and capricious for the Park Service not to follow its own manual, even if nonbinding. Under the FLREA, 16 U.S.C. § 6803(a), the Park Service must "provide the public with opportunities to participate in the development of or changing of a recreation fee," and Manual 22A's Appendix L supplies the only standards for evaluating whether Great Smoky Mountains complied with that requirement. SFW focuses on Appendix L's instruction that parks "*must* notify and obtain input from their Congressional delegation for the local area," "[f]ederal, state and county officials," "[l]ocal chamber of commerce (or equivalent)," and "[c]ommercial tour operators," R. 72-1, PID 1690, but fails to show that these notice provisions render the park's decision-making process arbitrary and capricious.

First, Great Smoky Mountains contacted a number of public officials at the federal, state, and local levels. In February 2012, the park's superintendent spoke with the offices of the four U.S. Senators from Tennessee and North Carolina and three local U.S. Representatives. In a November 2011 summary of the public-engagement process, park staff noted that "a detailed briefing of the fee proposal" had been sent to "state and local elected representatives and government officials." R. 39-2, PID 536. The park reported, "No written comments were received, though verbal comments were generally positive with the exception of the Swain County, NC commissioners (one of seven counties neighboring the park) who were against any backcountry camping fees in principle." *Id.* SFW points out that David Monteith, a Swain County Commissioner, had, in fact, submitted a written comment on August 16, 2011, explaining his opposition to the fee. This is not fatal. Although the Park Service mistakenly reported no written comments had been received, it accurately described the opposition in Swain County. Additionally, the feedback included in the summary substantiates that the park conducted outreach to local officials.

Second, Great Smoky Mountains incorporated chambers of commerce into its public-engagement plan. In July 2011, park staff listed chambers of commerce among the stakeholders to be contacted, and the November 2011 public-engagement summary reported that "[n]o comments were received from local Chambers of Commerce." *Id.* Although the administrative record does not include actual documentation of contacts with chambers of commerce, the

summary suggests that the chambers were contacted, and SFW offers only a conclusory allegation that the park failed to follow through on its plan. Lastly, Great Smoky Mountains made contact with several commercial-tour operators, which the Park Service described as commercial-use authorization (CUA) holders in its internal correspondence. The park's concessions-management specialist contacted six of the CUA holders in July 2011 and reported their "universally positive or very positive" feedback. *Id.* at PID 494. The specialist also forwarded the proposal to seventeen other CUA holders.

SFW also emphasizes that Great Smoky Mountains received hundreds of comments from the public, the majority of which were negative. The quantity of feedback from the public suggests, contrary to SFW's position, that the Park Service fulfilled its duty to solicit public input. Further, the Park Service consistently noted the considerable public opposition and factored that feedback into its considerations. The FLREA does not require a fee to have a majority of public support, only "public participation," and Great Smoky Mountains gave the public ample opportunity to participate in the process and provide feedback on the planned fee.

**3.**

SFW also argues that the Park Service misled the public about the rationale for the fee, depriving the public of a real opportunity to participate. SFW identifies three alleged misrepresentations in the administrative record: (1) complaints about the old reservation system; (2) crowding at backcountry campsites; and (3) funding for backcountry rangers.

First, SFW argues that the Park Service exaggerated the number of complaints it received about problems with the Wilderness Trakker reservation system. In a June 2011 draft of the fee proposal, the Park Service explained that "[t]he park consistently receives complaints about the amount of time it takes to get a backcountry reservation" and "[c]ustomers frequently report calling for days before they can reach someone." R. 39-1, PID 414. SFW argues that this description of customer complaints was a pretext for collecting fee revenue, noting that the original impetus for the change in the reservation system was not complaints, but a notification about discontinued technical support.

The administrative record contains seven email complaints from visitors about the reservation system, dating from 2009 to 2011. These visitors reported difficulty getting through to the reservation system after multiple calls, and expressed concern that they would not be able to reserve a campsite for an upcoming trip. When Great Smoky Mountains' chief ranger solicited feedback from employees, one of the park rangers noted that the reservation system was "very frusterating [sic] for visitors and staff." *Id.* at PID 469. A second park ranger added, "Visitors get mad at our staff when we cannot make the reservations for them." *Id.* at PID 475. Another employee agreed "that there's a set of problems with the system as it is regarding confusion, wait times on the phone, non-compliance and crowding." *Id.* at PID 485.

Great Smoky Mountains also heard accounts of reservation-system issues during the public-engagement process. In a written comment submitted at an open house, a former seasonal ranger recalled, "I can't count how many times I had to try to placate irritated/frustrated would-be backpackers because they were trying to do the right thing (ie [sic] getting the proper permit) and they simply couldn't get through on the phone line to the backcountry office." R. 39-3, PID 652. The park also received an email from a Great Smoky Mountains volunteer who observed, "There is not a day that goes by that I do not take multiple calls from people who have had to make numerous phone calls, sometimes over multiple days, just to get through." R. 39-4, PID 856. A number of comments from the general public also noted difficulties with the reservation system. We discern no misrepresentation regarding the need for a new approach to reservations due to complaints.

Second, SFW argues that the Park Service misleadingly described overcrowding at campsites. In the July 2011 version of the fee proposal, Great Smoky Mountains stated that "capacities are frequently exceeded" at sites that did not require reservations, leading to "food storage violations, increased wildlife encounters and the need to close campsites to protect visitors and wildlife." R. 39-2, PID 499. SFW asserts that this description is contested by an allegation in its amended complaint that eighty percent of backcountry campsites at Great Smoky Mountains did not require reservations. But this statistic says nothing about overcrowding at the unreserved campsites or the Park Service's explanation that the new system was necessary specifically because there were no reservations at these sites. Further, the Park Service cites to a

number of comments in the record describing complaints about hikers without backcountry permits causing overcrowding at sites that did not require reservations.

Third, SFW argues that the Park Service misleadingly described its intention to use reservation-system revenue to pay for additional backcountry rangers. SFW emphasizes that the Park Service did not discuss additional rangers in its early meetings and correspondence. When Great Smoky Mountains sought approval to begin the civic-engagement process, the park's assistant superintendent wrote, "The primary purpose of the permit reservation fee would be to cover the cost of administrating an improved permit system that significantly enhances visitor convenience and experience." R. 39-1, PID 397. A memorandum submitted to the Washington office stated that the fee would "cover the costs" of switching to an online reservation system and there would be "no increase in overall annual revenue" because all of the income would be applied to the service fees. *Id.* at PID 402–03.

After the national office approved the park's request to begin public engagement in 2011, Great Smoky Mountains staff began considering an increase in the number of backcountry rangers. In a July 1 public-engagement plan, the Park Service brought up the "[e]ffects of more rangers" in the backcountry, and the July draft of the fee proposal mentioned that a law-enforcement position "would increase park presence in the backcountry and improve permit and reservation compliance." *Id.* at PID 424, 429. By July 15, the Park Service had developed a briefing paper that directly tied the fee to funding for more ranger positions, stating, "The Park would collect fees to cover the cost of making reservations and issuing permits, and to fund backcountry office staffing and backcountry ranger positions." *Id.* at PID 436. Further, the briefing paper specifically noted that revenues would be used to fund "at least 2 seasonal commissioned Rangers to patrol the backcountry." *Id.* at PID 435. The Park Service subsequently incorporated the hiring of additional rangers into all planning for the proposed fee. In the press release to announce the public-engagement process, Great Smoky Mountains expressed its intention to "hire additional Rangers who would exclusively patrol the backcountry" if it imposed the fee. In the final proposal, the Park Service reiterated that it would "hir[e] two dedicated seasonal law enforcement positions." R. 39-2, PID 622.

The Park Service's decision to modify its plan in advance of the public-engagement process was not arbitrary or capricious. The Supreme Court has explained that agencies are "fully entitled" to "change[] their minds" during the decision-making process, so long as the ultimate decision is not arbitrary and capricious. *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007). SFW appears to argue that the Park Service did not actually intend to hire rangers. However, the final proposal approved by the Washington office states that the Park would hire two seasonal rangers, and the Great Smoky Mountains press release announcing the fee approval stated that the park would "expand its backcountry Ranger presence to better protect park resources." R. 39-3, PID 627. Absent evidence to the contrary, there is no reason to believe that the Park Service deceived the public when it said it would hire rangers.

## C.

Finally, the FLREA also requires the Park Service to "publish notice of a new recreation fee or a change to an existing recreation fee established under this chapter in local newspapers and publications located near the site at which the recreation fee would be established or changed." 16 U.S.C. § 6803(b). The administrative record does not include press reports or evidence that Great Smoky Mountains placed advertisements in local newspapers. However, Great Smoky Mountains issued press releases announcing potential changes to the fee structure and inviting the public to open houses on July 29 and August 8, 2011. It reported that "[n]umerous media interviews were granted with television, radio, internet, and print media during late July and August." R. 39-2, PID 536. Further, the public comments included a number of references to press reports in local print media. Even if the Park Service did not publish an official notice of the fee, it widely disseminated its proposal and the Great Smoky Mountains fee plan was widely reported in the local media. Thus, there was substantial compliance with § 6803(b) and its purposes were served. *See* 5 U.S.C. § 706 ("[D]ue account shall be taken of the rule of prejudicial error."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654–55 (6th Cir. 2009) (explaining that harmless-error review applies to claims of noncompliance with administrative procedures).

**III.**

SFW also challenges the district court's denial of its motion to supplement the administrative record. We review the district court's denial of a motion for discovery beyond the administrative record for an abuse of discretion. *Sierra Club v. Slater*, 120 F.3d 623, 639 (6th Cir. 1997). In an APA action, our review generally is "limited to the administrative record, which includes materials compiled by the agency at the time its decision was made." *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of the Fed. Highway Admin.*, 756 F.3d 447, 464–65 (6th Cir. 2014) (citing *Slater*, 120 F.3d at 638). "The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Kroger Co. v. Reg'l Airport Auth. of Louisville & Jefferson Cty.*, 286 F.3d 382, 387 (6th Cir. 2002) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam)).

Supplementation of the administrative record may be appropriate "when an agency has deliberately or negligently excluded certain documents from the record, or when a court needs certain 'background' information to determine whether the agency has considered all relevant factors." *Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 465 (citing *Slater*, 120 F.3d at 638); *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1428 (6th Cir. 1991). SFW argues that the Park Service deliberately excluded documents necessary to enable judicial review. We disagree.

**A.**

SFW argues that the Park Service deliberately or negligently excluded (1) oral complaints about the reservation system, (2) oral comments from public officials, (3) media interviews, (4) written complaints of overcrowding, (5) email communications, (6) an announcement on the Great Smoky Mountains website, and (7) information about other fees in the park.

First, the Park Service could not include oral complaints in the administrative record unless there was documentation, and SFW does not allege any documentation that could be added to the record. SFW's second objection regarding conversations with political officials fails for the same reason. Third, SFW objects to the Park Service's failure to include media interviews in the record, but there is no allegation that the Park Service documented these

interviews and purposefully excluded that documentation. Fourth, SFW argues that the Park Service excluded written complaints of overcrowding. In its answer to SFW's complaint, the Park Service explained that its response to a Freedom of Information Act request did not reflect written complaints that the Park Service did not archive. Again, SFW complains that these missing complaints are not in the record but fails to explain how the Park Service could supplement the record with unavailable documents.

SFW next challenges the failure to include deliberative email communications. In July 2011, the park's chief ranger and backcountry specialist circulated the fee proposal to park employees for feedback. The administrative record includes twelve employee responses, but the hard-copy printouts of emails scanned into the record also indicate that either the chief ranger or the backcountry specialist replied to the employees. Those replies are not included in the record. SFW suggests that the Park Service deliberately excluded these replies, but there is no suggestion that the reply emails were relevant to the Park Service's decision. SFW also points to two public comments to which the backcountry specialist replied and an email in which the park's superintendent noted that he sent someone a "thanks note" for feedback. There is similarly little reason to believe that the backcountry specialist's responses to the public comments or the superintendent's thank-you note were relevant or deliberately excluded.

SFW asserts that Great Smoky Mountains "scrubbed" an announcement from its website, citing to a document attached to one of its motions in the district court. This document is in the administrative record; it is not clear what SFW believes was excluded. Lastly, SFW cites to a document detailing Great Smoky Mountains' frontcountry camping fees and argues there is no information about the date those fees were imposed. But it is not contested that Great Smoky Mountains charged fees before 2005, so this information is not necessary background.

**B.**

SFW also argues that the record should be supplemented with documentation from public officials opposing the fee. There are five documents that SFW would add to the record: (1) a resolution of the Board of Commissioners of Swain County; (2) an affidavit of Ted A. Burkhalter, Jr., a Blount County Commissioner; (3) a resolution of the Board of Commissioners

of Blount County; (4) a resolution of the Knox County Commission; and (5) a proclamation of the Speaker of the Tennessee House of Representatives. These documents were executed in 2013 or 2014, after the fee approval.

The only document addressing contemporaneous objections to the fee is the Burkhalter affidavit, which asserts that no one contacted him about the fee, that he would have voiced his opposition if given the chance, and that Great Smoky Mountains' superintendent acknowledged that he had not directly contacted anyone from the Blount County Commission. But this affidavit does not contradict the outreach efforts described in the administrative record; the Park Service did not claim to have contacted Burkhalter individually, and neither the FLREA nor Manual 22A requires the Park Service to contact every local official. Further, the superintendent did not claim to make all the contacts personally. The record substantiates that the Park Service reached out to at least some local officials.

The other four documents are evidence of opposition that arose after the fee was imposed. The Park Service could not have considered this opposition at the time of its decision. *Davidson v. U.S. Dep't of Energy*, 838 F.2d 850, 855 (6th Cir. 1988) (declining to supplement the record when plaintiffs failed to raise the issues during a rulemaking process); *cf. Latin Ams. for Soc. & Econ. Dev.*, 756 F.3d at 475 (noting that an agency could not have considered documents that "post-date" the agency action). Thus, these documents are not relevant to an evaluation of the agency's reasoning and do not warrant supplementing the administrative record.

**IV.**

For these reasons, we **AFFIRM**.